IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 05-157 |
| MARVIN GOLDBERG | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

I.       BACKGROUND

       Marvin Goldberg was the owner and operator of a veterinary prescription drug supply business that repeatedly ignored warnings from the Food and Drug Administration ("FDA") regarding the illegal nature of his business involving the sale of veterinary prescription drugs without a valid prescription or order from a licensed veterinarian who had a legitimate veterinarian-client-patient relationship with the customer or animal.  In addition to warnings from the FDA, Goldberg received letters from various state regulatory agencies in California, Kentucky, Louisiana, Maryland, and Texas ordering him to cease and desist his illegal distribution of veterinary prescription drugs.  In spite of all the warnings, Goldberg continued to operate his business and convinced Jack Wilkes, D.V.M., an elderly veterinarian whom Goldberg had never met, that Goldberg's business was a licensed wholesale drug distributor, in order to get Dr. Wilkes to lend Goldberg his veterinary license so that Goldberg could obtain veterinary prescription drugs from pharmaceutical wholesalers.  Goldberg also obtained Dr. Wilkes' DEA number to order and receive controlled substances from pharmaceutical wholesalers without Dr. Wilkes' knowledge and consent.

In furtherance of the fraud scheme, Goldberg used Dr. Wilkes' name and veterinary license to obtain prescription veterinary drugs from pharmaceutical companies by falsely represented to these companies that the drugs he was purchasing were for use by Dr. Wilkes in his veterinary practice and were not for resale.  The false representations caused the pharmaceutical companies to ship the drugs to Goldberg.  Goldberg marketed the drugs through an internet website and unsolicited facsimiles to animal owners.  Goldberg also sold certain prescription veterinary drugs to an undercover FDA agent without a prescription.

A search warrant executed at Goldberg's residence/place of business on February 17, 2005 resulted in the seizure of approximately $40,000 in prescription injectable veterinary drugs, business documents pertaining to Goldberg's interaction with the pharmaceutical companies which contain the false representation that a licensed veterinarian had or would prescribe the drugs being ordered and Goldberg's drug transactions with customers across the country, and multiple vials of Stanozolol, an equine steroid which is a controlled substance which Goldberg obtained using the veterinarian's DEA number.

Following the search, FDA Special Agent Greg Tremaglio visited Dr. Wilkes' home.  During the visit, Dr. Wilkes showed the agent documents that he had just received from Goldberg which purported to be treatment logs that Goldberg had created for Dr. Wilkes in the event he was visited by law enforcement officers.  A consensually recorded telephone conversation between Dr. Wilkes and Goldberg revealed that Goldberg had duped Dr. Wilkes about the legality of Goldberg's business, Goldberg had created the fictitious treatment logs in response to the FDA investigation, and that Goldberg used Dr. Wilkes' DEA number to acquire Stanozolol on numerous occasions without Dr. Wilkes' knowledge and consent.

A financial analysis of Goldberg's business and bank records has demonstrated the illegal veterinary prescription drug business yielded a total of $1,772,955 in sales and a total of $1,187,879 in profits.

II.     SENTENCING CALCULATION

    A.     <u>Statutory Maximum Sentence</u>.

Goldberg was convicted of wire fraud, in violation of 18 U.S.C. § 1343 (Count 1); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2 through 28); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) (Counts 29 through 36); introduction of misbranded drugs into interstate commerce, in violation of 21 U.S.C. § 331(a) (Counts 37 and 39); and, misbranding drugs, in violation of 21 U.S.C. § 331(k) (Counts 38 and 40). Goldberg faces a statutory maximum sentence of 612 years imprisonment, a $10,000,000 fine, three years supervised release, and a $4,000 special assessment.

    B.     <u>Sentencing Guidelines Calculation</u>.

In imposing sentence, the Court must take into account the considerations of sentencing set forth in 18 U.S.C. § 3553(a). <u>United States v. Booker</u>, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established in the Sentencing Guidelines. The Third Circuit has confirmed: "In consideration of the § 3553(a) factors, a trial court must calculate the correct guidelines range applicable to a defendant's particular circumstances." <u>Cooper</u>, 437 F.3d at 330. This Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the <u>Booker</u> decision. <u>Id.</u>; see also <u>United States v. Giaquinto</u>, 441 F.3d 195, 196 (3d Cir. 2006) (court may continue to determine by a

preponderance of the evidence and consider the defendant's relevant conduct in determining the guideline range). In short, the guideline range should be calculated in the same manner as it was prior to Booker.

> [W]e emphasize that the sentencing courts in this Circuit should continue to follow the requirement to "consider" the Guidelines by calculating a Guidelines sentence as they would have before Booker, including formally ruling on the motions of both parties and stating on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and taking into account this Circuit's pre-Booker caselaw, which continues to have advisory force.

United States v. King, 454 F.3d 187, 196 (3d Cir. 2006).

In this case, as stated in the presentence report (PSR), the correct guideline calculation is as follows. Pursuant to Sentencing Guidelines § 2B1.1, Goldberg, who received profits totaling between $1,000,000 and $2,500,000 and continued to operate his business in spite of notices from federal and state agencies that he was in violation of the law or ordering him to cease and desist, has a total offense level of 25. He also has a criminal history category of I. Thus, the guideline range for imprisonment is 57 to 71 months.

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a). Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . that . . . is in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A full review of all pertinent factors supports the conclusion that a within-guideline sentence is appropriate in this case. The most pertinent factor is the loss amount.

In theft and fraud cases, Sentencing Guideline § 2B1.1(b)(1) sets out a graduated scale of progressively increasing offense levels based upon the "loss" resulting from the crime. "Loss" is defined as the greater of actual or intended loss. U.S.S.G. § 2B1.1, comment. (n.2(A)). In this instance the question is the "actual loss," which is defined is in the guidelines as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. In calculating this figure, the Guidelines require the district court to do no more than "make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment. (n.2(c)); see United States v. Schaeffer, 384 F.3d 326, 334 (7th Cir. 2004) ("[A]ccording to the Guidelines, in order to pass muster, loss calculations only need to be a reasonable estimate.") The district court's estimate should be "based on

available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . the fair market value of the property unlawfully taken." U.S.S.G. § 2B1.1, comment. (n.2(C)(i)).

In theft cases, use of retail value has long been recognized as a reasonable means to estimate loss amounts for sentencing purposes, particularly when the goods at issue were illegally obtained from the marketplace. See, e.g., United States v. Carrington, 96 F.3d 1, 6 (1st Cir. 1996) ("it was reasonable for the court to adopt the retail rather than the wholesale value of the cars, since all of the dealerships from whom Carrington obtained the cars were engaged in retail sales of automobiles."); United States v. Williams, 50 F.3d 863, 864 (10th Cir. 1995) (affirming use of retail value to establish loss because "jewelry was stolen from a retail establishment, not a wholesaler"); United States v. Shea, 984 F.2d 1339, 1345 (3d Cir. 1992) (rejecting defendants' contention that loss amount was not retail value, but 25% discounted price victim would have accepted or even lower wholesale replacement cost).

However, in fraud cases, the monetary table in the guideline is intended to reflect "the harm to the victim and the **gain** to the defendant." U.S.S.G. § 2B1.1, comment. (backg'd) (emphasis added). Federal agencies may be the victims of fraud in misbranding drugs. There is no meaningful distinction between the government as victim and individual consumer victims because it is possible for either or both to be defrauded. In this case, Goldberg intended to and did profit from his activity and at least the FDA was defrauded by his actions.[1] Adjusting the guideline range based on the amount involved, that is, the defendant's profit, is therefore

---

[1] Since the drugs sold to the defendant's customers were illegally obtained, they had no cognizable value insofar as these drugs were contraband and thus subject to seizure upon discovery by the FDA.

appropriate.  See, United States v. Marcus, 82 F.3d 606, 610 (4th Cir. 1996) (the defendant's gross sales were the appropriate measure of the actual loss).

In this case, inasmuch as the veterinary prescription drugs were illegally obtained by the defendant, they were contraband, therefore, any sale of the illegally obtained drugs constituted gain to the defendant.  The FDA has analyzed Goldberg's business and banking records (Sky Bank) from July 17, 2002 until February 17, 2005.  The bank deposit analysis revealed revenue in the amount of $1,772,955 for Equihealth, c/o Marvin and Mark Goldberg.  Marvin Goldberg wrote all of the checks drawn on the account.  Marvin Goldberg executed checks payable to Mark Goldberg totaling approximately $108,000, including a check in the amount of $20,000 the day after Marvin Goldberg's home and his business location was searched.  Checks totaling approximately $62,000 were made payable to Dr. Jack Wilkes.  All of the other checks were made payable to Marvin Goldberg's creditors.

Based on the cost of the illegally purchased veterinary prescription drugs from Equihealth's suppliers, in comparison to the price Equihealth sold the drugs to its customers, the FDA determined that Goldberg had an average profit margin of approximately 67%.  Thus, Goldberg ultimately earned profits totaling approximately $1,187,879 as a result of his illegal veterinary prescription drug business.  Therefore, the government submits that Goldberg's gain in the amount of $1,187,879 is the appropriate measure of loss for purposes of the Sentencing Guidelines.

C.      The District Court's Construction of the Sentencing Guidelines

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in United States v. Booker, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted), citing United States v. King, 454 F.3d 187, 194, 196 (3d Cir. 2006); United States v. Cooper, 437 F.3d 324, 329-30 (3d Cir. 2006).

The Third Circuit has explained that the Court must consider the advisory giudeline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address

it." Cooper, 437 F.3d at 329.  See also United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006) (directing district courts to explain all guideline determinations and final sentences, stating, "There is simply no substitute for on-the-record discussion and deliberation.  It ensures that the parties are fully informed of their rights and obligations and that the appellate court will be able to assess the merits of the final judgment.");  United States v. King, 454 F.3d 187, 196-97 (3d Cir. 2006) (district courts "should observe the requirement to state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review.").[2]

III.    ANALYSIS.

    A    Importance of the Guideline Range.

The advisory guideline range carries considerable weight even after Booker.  As the Third Circuit stated, "a within-guidelines range sentence is more likely to be reasonable than one that lies outside the advisory guidelines range . . . ."  Cooper, 437 F.3d at 331.  The Court later noted:  "The farther a sentence varies from the advisory guidelines range, the more compelling the judge's reasons must be."  United States v. King, 454 F.3d 187, 195 (3d Cir. 2006), quoting United States v. Jordan, 435 F.3d 693, 696-97 (7th Cir. 2006).

The importance of the final guideline range has nothing to do with the guidelines' former mandatory status, which was eliminated in Booker.  Rather, the final guideline range is

---

[2] In United States v. Grier, 449 F.3d 558, 574-75 (3d Cir. 2006), the panel held that the solitary statement, "The Court believes that 100 months is reasonable in view of the considerations of section 3553(a)," was insufficient to explain the district court's reasoning, and remanded for resentencing.  This opinion was subsequently vacated and rescheduled for hearing en banc on a separate issue in the case, regarding whether the preponderance standard applies at sentencing to proof of additional uncharged crimes.  The holding with respect to the sufficiency of the sentencing explanation appears to represent the view of the Third Circuit, as made clear in the other cases cited above.

the starting point for determining reasonableness for three reasons: (1) only the guidelines comprehensively examine the full panoply of sentencing considerations; (2) the guidelines represent decades of nationwide experience and study; and (3) they are the only measure for avoiding unwarranted sentencing disparities. Congress explicitly created the Sentencing Commission and the guideline system to achieve these ends.

First, the guidelines are much more comprehensive than any other Section 3553(a) factor. Each of the other 3553(a) factors addresses only a single facet of the many issues posed by sentencing. "[T]he factors the sentencing commission was required to use in developing the Guidelines are a virtual mirror image of the factors sentencing courts are required to consider under Booker and § 3553(a)." United States v. Shelton, 400 F.3d 1325, 1332 n.9 (11th Cir. 2005); Statement of Judge Ricardo H. Hinojosa, Chair of the United States Sentencing Commission, quoted in United States v. Peach, 356 F. Supp. 2d 1018, 1020-22 (D.N.D. 2005). In formulating the guidelines, the Commission was required to and has considered all of the Section 3553(a) factors. See 28 U.S.C. §§ 991(b)(1), 994(b)(1), (c), (f), (g), (m); U.S.S.G. § 1A1.1 Editorial Note.

Second, the guidelines are the product of years of nationwide experience and sustained study. In drafting the original guidelines (which became effective with respect to offenses committed on or after November 1, 1987), the Sentencing Commission canvassed prior sentencing practice, identifying aggravating and mitigating factors. 28 U.S.C. § 994(m); U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 16-17 (1987). Since then, the Commission has continued to study district court and appellate sentencing decisions, and has fine-tuned the guidelines to take them into account.

U.S.S.G. App. C.  Indeed, the Booker Court specifically affirmed that the Commission will continue to study appellate and district court sentencing decisions, and "will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices." Booker, 543 U.S. at 263 (Breyer, J.).

The Sentencing Commission's incomparable flow of nationwide information, and its years of concentrated study on this topic, merit strong consideration by judges who are assigned the task of determining appropriate sentences for criminal conduct. United States v. Wilson, 350 F. Supp. 2d 910, 914-25, reaffirmed on denial of reconsideration, 355 F. Supp. 2d 1269, 1271-88 (D. Utah 2005); United States v. Wanning, 354 F. Supp. 2d 1056, 1060-62 (D. Neb. 2005); Peach, 356 F. Supp. 2d at 1020-22.

Third, the correctly calculated guideline range is the only means to evaluate the statutory sentencing goal on which Booker placed so much emphasis: "the need to avoid unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6).[3]  Congress, the Court, and the guidelines all seek to minimize such disparity compared to "all other similar sentences imposed nationwide." United States v. White, 406 F.3d 827, 837 (7th Cir. 2005).  The Sentencing Guidelines provide the comprehensive information and guidance about sentencing around the

---

[3] Every opinion in Booker acknowledged the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible. See, e.g., Booker, 543 U.S. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 744 (same) ("Congress' basic statutory goal of diminishing sentencing disparity depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction."); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 303-04 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

nation that is essential to accomplishing Congress' goal of uniform federal sentencing. "The only way of avoiding gross disparities in sentencing from judge-to-judge and district-to-district is for sentencing courts to apply some uniform measure in all cases. The only standard currently available is the Sentencing Guidelines." Wilson, 350 F. Supp. 2d at 924; Wanning, 354 F. Supp. 2d at 1061-62 ("we have no meaningful substitute for the neutrality, coherence, and equality" that the guidelines provide). Thus, measuring reasonableness in relation to the guideline range serves "to minimize the wide disparity in sentencing across the country for similarly situated defendants that led to the enactment of the Guidelines in the first place." United States v. Paulus, 331 F. Supp. 2d 727, 733 (E.D. Wis. 2005).

Thus, the Third Circuit in Cooper stated that "'[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country,' and provide a natural starting point for the determination of the appropriate level of punishment for criminal conduct." Cooper, 437 F.3d at 331, quoting United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005).[4]

---

[4] In aiming for uniform sentencing, the appropriate focus is on sentences imposed in federal court for like offenses. A panel of the Third Circuit correctly found "no merit in [the] argument that the District Court should have considered what [the defendant]'s sentence would have been had he been convicted of a similar state-law offense. Booker directs our reasonableness review to the factors set forth under federal law for federal criminal offenses. That a separate sovereign chooses to implement its criminal sentencing scheme in a different manner does not impact our analysis under § 3553(a)(6), which focuses on the need to avoid unwarranted disparities among sentences issued by federal courts for violations of federal law." United States v. Cropper, 2006 WL 372338, at *4 n.7 (3d Cir. Feb. 17, 2006) (not precedential).

Likewise, in imposing sentence, a district court need not focus on disparate sentences imposed on co-defendants in the same case, as opposed to sentences imposed nationwide on like offenders. United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006).

Accordingly, while many appellate courts have reversed as unreasonable sentences imposed outside the applicable guideline ranges,[5] reversals of sentences imposed within the guideline range have been extraordinarily rare, and have occurred only where the appellate court found that the district court did not adequately explain the sentence.  See, e.g., United States v. Carty, 453 F.3d 1214, 1220-21 (9th Cir. 2006).  Moreover, the Courts of Appeals have emphasized that the further outside the range, either above or below, a sentence falls, the stronger must be the justification for such disparate sentencing.[6]

---

[5]  See, e..g, United States v. Zapete-Garcia, 447 F.3d 57 (1st Cir. 2006); United States v. Smith, 445 F.3d 1 (1st Cir. 2006); United States v. Davenport, 445 F.3d 366 (4th Cir. 2006); United States v. Hampton, 441 F.3d 284 (4th Cir. 2006); United States v. Moreland, 437 F.3d 424, 434-37 (4th Cir. 2006); United States v. Duhon, 440 F.3d 711 (5th Cir. 2006); United States v. Goody, 442 F.3d 1132 (8th Cir. 2006); United States v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006); United States v. McVay, 447 F.3d 1348, 1357 (11th Cir. 2006).

[6]  "[T]he farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed."  United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005).  The Third Circuit cited this view with approval in King.  Accord United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006); United States v. Gatewood, 438 F.3d 894, 896 (8th Cir. 2006); United States v. Moreland, 437 F.3d 424, 434 (4th Cir. 2006).

The Supreme Court has granted certiorari to further clarify the significance of the Sentencing Guidelines.  In United States v. Claiborne, 439 F.3d 479 (8th Cir. 2006), cert. granted, 2006 WL 2187967 (U.S. Nov. 3, 2006), the key issue presented is whether, as stated in these cases, a sentence which constitutes a substantial variance from the guidelines must be justified by extraordinary circumstances.  The pendency of this case need not concern the Court here, however, as the government asserts that a sentence within the guideline range is most appropriate in this case, and there is no persuasive basis for any variance.  In a second case pending before the Supreme Court, United States v. Rita, 177 Fed. Appx. 357 (4th Cir. May 1, 2006) (per curiam; not precedential), cert. granted, 2006 WL 2307774 (U.S. Nov. 3, 2006), the significant question presented is whether it is consistent with Booker to accord a presumption of reasonableness to within-guidelines sentences.  The resolution of that case also is not significant here.  The Third Circuit, as opposed to the Fourth Circuit and others, has already made clear that no presumption of reasonableness applies to a guideline range.  Cooper, 437 F.3d at 331-32.  Thus, the government here does not advocate a guideline sentence based on any presumption, but

B. <u>Application of the § 3553(a) Factors</u>.

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Section 3553(a)(4) and (5) specifically direct the Court to consider the applicable guidelines, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing, which, as explained above, is best accomplished through faithful application of the guidelines. The other 3553(a) factors also point to this conclusion. Here, the defendant engaged in a crime with potentially serious consequences to the far too many animals owned by those who availed themselves of the defendant's sale of veterinary prescription drugs. The defendant was repeatedly warned by federal and state agencies of the illegality of his business practices, but the defendant's greed prevailed. Therefore, his crimes fall squarely within the class of cases to which the applicable guidelines are addressed, and thus consideration of the nature of the offense, § 3553(a)(1), counsels in favor of the guideline sentence.

Further, the defendant's history supports the need for significant incarceration. He has demonstrated his unwillingness to conform his actions to the law, based on his own perceived interpretation of the law and desires. It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Furthermore, the recommended sentence of incarceration affords adequate deterrence to others who would commit a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated. § 3553(a)(2).

---

rather based on the persuasive force of the guidelines and the other considerations of sentencing, as set forth above.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ." § 3553(a)(2)(D).  Also, restitution is not an issue in this case.  § 3553(a)(7).

At the same time, the defendant has not set forth any persuasive argument for leniency.[7]

Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition in this case of a within-guideline sentence.  For all of these reasons, the government respectfully recommends that the Court sentence the defendant within the guideline range defined above.

> Respectfully submitted,
>
> PATRICK L. MEEHAN
> United States Attorney
>
>
>   /S/ Anita Eve
> ANITA EVE
> Assistant United States Attorney

---

[7] It is incumbent on the Court to address any defense argument in determining the final sentence.  See Cooper, 437 F.3d at 329 (directing that "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it.").

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by me, this date, by electronic filing upon the following:

**THOMAS IVORY, Esquire**
THOMAS IVORY LAW OFFICE
834 CHESTNUT ST.
SUITE 206
PHILADELPHIA, PA 19107


　　　　/S/ Anita Eve
ANITA EVE
Assistant United States Attorney


DATED: December 7, 2006